UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STONEEAGLE SERVICES, INC.,

       Plaintiff,

v.                              Case No.: 8:13-cv-2240-T-33MAP

PAY-PLUS SOLUTIONS, INC., and
PREMIER HEALTHCARE EXCHANGE, INC.,

       Defendants.
_____/

## ORDER

This matter comes before the Court pursuant to Plaintiff
StoneEagle Services, Inc.'s Daubert Motion to Exclude Thomas
N. Turi as an Expert Witness (Doc. # 128) and Defendants Pay-
Plus Solutions, Inc. ("PPS") and Premier Healthcare Exchange,
Inc.'s ("PHX") Motion to Exclude Testimony of Mr. Weston Anson
(Doc. # 144).  Both Motions are ripe for this Court's review.
For the reasons set forth at the Motion hearing conducted on
June 17, 2015, and set forth below, the Motions are denied.[1]

## I. Background

---

[1] Although Defendants' Motion was filed under seal, the Court
declines to file the present Order under seal. "The operations
of the courts and the judicial conduct of judges are matters
of utmost public concern and the common-law right of access
to judicial proceedings, an essential component of our system
of justice, is instrumental in securing the integrity of the
process." Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th
Cir. 2007)(internal citations omitted).

In this patent infringement action, Plaintiff alleges that Defendants willfully infringed Plaintiff's rights under two patents: Reissue Patent No. US RE43,904 E ("the 904 Patent") and Reissue Patent No. US RE44,748 E ("the 748 Patent"). (Doc. # 66 at ¶¶ 1, 8-10 & Ex. A, B). Both patents cover a health care provider reimbursement system, by which a payor, such as an insurance company, makes "a virtual payment to a medical provider by transmitting a stored-value card account payment of the authorized benefit amount, together with an explanation of benefits." (Id. at ¶¶ 14-16 & Ex. A, B). Plaintiff alleges that Defendants' health care benefits payment processing system, "Pay-Plus™ Select," directly competes with Plaintiff's patented system. (Id. at ¶¶ 17-18). Specifically, Plaintiff "asserts different infringement positions against the Pay-Plus™ Select service: (1) the 'one-fax system' allegedly infringes all of the asserted claims; and (2) the 'two-fax system' and 'hardcopy mailing system' each allegedly infringe claims 7, 13, 19, and 25 of the 748 Patent." (Doc. # 143 at 8).

On December 2, 2014, Defendants filed Answers to the operative complaint, including, as an affirmative defense, a challenge to the validity of the patents pursuant to 35 U.S.C. § 101. (Doc. # 67 at 7; Doc. # 68 at 7). Thereafter, on

2

December 9, 2014, Defendants filed a Motion for Judgment on the Pleadings arguing that the claims at issue are directed to patent-ineligible subject matter under 35 U.S.C. § 101, which warranted judgment in Defendants' favor. (Doc. # 69). This Court denied Defendants' Motion without prejudice, partially as claim construction had not occurred in this action. (See Doc. # 91). This Court held a Markman hearing on May 11, 2015 (Doc. # 183), and entered an Order on claims construction on June 4, 2015. (Doc. # 197).

Now before the Court are the parties' Daubert Motions. (Doc. ## 128, 144). The Court will address each in turn.

## II.   Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 is a codification of the Supreme Court's landmark case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In Daubert, the Court described the gatekeeping function of the district court to ensure expert testimony and evidence "is not only relevant, but reliable." Id. at 589. As stated in the Advisory Committee Notes accompanying Rule 702 of the Federal Rules of Evidence, "A review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule." See Advisory Committee Notes to the 2000 Amendment to Rule 702. In addition, the trial judge is afforded broad discretion in deciding Daubert issues. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

In Rink v. Cheminova, Inc., 400 F.3d 1286 (11th Cir. 2005), the Eleventh Circuit set forth a three-pronged approach for doing so:

> To fulfill their obligation under Daubert, district courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized

> expertise, to understand the evidence or to
> determine a fact in issue.

Id. at 1291 (internal citations omitted). The party offering an expert has the burden of satisfying each of these elements by a preponderance of the evidence. Id. at 1292; see also Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

## III. **Analysis**

### a. **Plaintiff's Motion**

Defendants designate Mr. Thomas Turi as an expert witness under Fed. R. Civ. P. 26(a)(2), regarding the alleged invalidity of both the 904 and 748 Patents. (Doc. # 128 at 1). Mr. Turi has also been designated as a rebuttal expert witness regarding the alleged non-infringement of both the 904 and 748 Patents. (Id.). Plaintiff moves the Court to "exclude at trial and from any consideration by the Court the expert reports of Thomas Turi . . . as well as any opinion testimony by Mr. Turi, argument, or evidence relating to Mr. Turi's opinions." (Id.).

Plaintiff contends that Mr. Turi is not an expert on patents, patent validity or invalidity, or patent infringement or non-infringement. (Id. at 2). Specifically, "[a]s he admitted in his deposition: (a) Mr. Turi had

literally no background or experience with patents before being engaged by Defendants in this case; and (b) everything he knows about patent validity and infringement he learned since being engaged in this case." (Id.). Second, Plaintiff argues that Mr. Turi's "opinions regarding the supposed obviousness of [the 904 and 748 Patents] are based on an impermissible hindsight methodology expressly rejected by the Federal Circuit Court of Appeals." (Id.).

Third, Plaintiff posits that "Mr. Turi's deposition makes clear that 'his' reports . . . were in large part actually prepared by Defendants' counsel." (Id.). Finally, Plaintiff asserts that Mr. Turi's non-infringement report "improperly contains rebuttal to the report submitted by [Plaintiff's] damages expert, Weston Anson, although Defendants submitted a separate rebuttal report authored by a different expert to Mr. Anson's damages report." (Id. at 2-3).

### i.  Competence and Qualification

According to Plaintiff, Mr. Turi's own testimony demonstrates that he lacks the qualifications needed to render any of the opinions contained in his invalidity report or his non-infringement report. (Id. at 4-7). Plaintiff argues that Mr. Turi "lacks any background or experience

regarding patents, patent invalidity, or patent non-infringement." (Id. at 5). Namely, Plaintiff provides that, by his own testimony, Mr. Turi is a "self-employed consultant with only nine (9) years' experience working for companies in the 'field of medical benefit payment systems.'" (Doc. # 174 at 3). To the contrary, Defendants suggest that Mr. Turi is a "leading expert in the field of healthcare benefits payment systems, including card-based healthcare payments, claim processing, and electronic data systems." (Doc. # 153 at 6). To that end, Defendants contend that Mr. Turi has worked and consulted in this field for the last twenty years. (Id.).

To support their position, Defendants assert that Mr. Turi currently is the founder and principal of his own consulting company, which serves "companies in the healthcare industry, including in the area of healthcare claim processing and payments." (Id.). Furthermore, Defendants submit that Mr. Turi previously held management positions at major companies in the electronic healthcare payment industry, including Comdata Corporation, Emdeon, Inc., IBM Corporation, Payspan, and National Processing Company. (Id.). While at IBM, Mr. Turi was an "associate partner in IBM's healthcare payer practices." (Id.). Subsequently, at Emdeon, Mr. Turi was a Senior Vice President and "created and executed

a strategy for positioning the company as a leader in electronic healthcare payment and remittance data exchange." (<u>Id.</u> at 6-7). Further, as an Executive Vice President at Comdata, "Mr. Turi built a business unit dedicated to electronic healthcare payment systems – including virtual card payments – into a market leader." (<u>Id.</u> at 7). Mr. Turi also has served as the "Co-Chair to the subcommittee of the Council for Affordable Quality Healthcare for establishing rules for Affordable Care Act electronic payments and remittance advice." (<u>Id.</u>).

"Under Rule 702, a witness may be qualified as an expert by virtue of his or her knowledge, skill, experience, training, or education." <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1342 (11th Cir. 2003)(internal quotation omitted). Mr. Turi's credentials indicate that he has worked and consulted in the field of healthcare claim processing and payments for roughly 15 years. Mr. Turi has held positions in the health care industry, which included (1) launching a business unit of Comdata, (2) acting as an associate partner in IBM's healthcare payer practice, and (3) serving as Co-Chair to the council for affordable quality healthcare sub-committee for the Affordable Healthcare Act for the electronic remittance advices and electronic payments

aspect of the Act. (See Doc. # 153-2). He is currently the founder and principal of his own consulting company. (Doc. # 153 at 6).

The Court agrees with Plaintiff that Mr. Turi is not an expert in patent law. However, because Mr. Turi has not been offered in that capacity, his lack of expertise in that area is not dispositive of his qualifications. (See Doc. # 128-3 at 4-5). Invalidity of patents and non-infringement of patents has been recognized as an appropriate subject for expert testimony. See Snellman v. Ricoh Co., Ltd., 862 F. 2d 283, 287 (Fed. Cir. 1988)(stating "expert testimony is admissible to explain the meaning of technical terms in the claims and to give an opinion on the ultimate question of infringement").

This Court concludes that Mr. Turi is competent to testify as an expert in this matter by virtue of his knowledge, skill, training, and experience. See Quiet Tech. DC-8, Inc., 326 F.3d at 1342 (by virtue of extensive education, training and experience, witness was properly qualified as an expert); QBE Ins. Corp. v. Jorda Enters., Inc., No. 10-21107-CIV, 2012 WL 913248, at *3 (S.D. Fla. Mar. 16, 2012)("The qualification standard for expert testimony is not stringent, and so long as the expert is minimally

qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.")(internal citation omitted). "[A]fter an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination." Id. On cross-examination, Plaintiff may elicit testimony from Mr. Turi regarding his experience in the area he was offered as an expert. However, these points do not render Mr. Turi unqualified for the purposes of the Court's Daubert analysis.

### ii. **Methodology**

Plaintiff submits that Mr. Turi's opinions regarding the supposed obviousness of Plaintiff's patents-in-suit are based on an impermissible hindsight methodology expressly rejected by the Federal Circuit Court of Appeals. (Doc. # 128 at 7).

"An obviousness analysis under 35 U.S.C. § 103 requires that the claimed invention be viewed 'as a whole.'" (Id.)(citing Princeton Biochemicals, Inc. v. Beckman Coulter, Inc., 411 F.3d 1332, 1337 (Fed. Cir. 2005)). Plaintiff contends that, following this rule, "the Court of Federal Claims [has] rejected an expert's opinions regarding obviousness because the expert used [a] 'part-by-part' approach." (Id.).

Here, Plaintiff claims that rather than considering each of Plaintiff's claimed inventions "as a whole," Mr. Turi used a "part-by-part" analysis "in which he separated each claim into different elements and then searched for (or was given) prior art references supposedly corresponding to each such element." (Id. at 8). In response, Defendants argue that Mr. Turi "has identified prior art that discloses every limitation of the asserted claims." (Doc. # 153 at 14). Mr. Turi then explains why "a person of ordinary skill in the art would have combined the prior art in the fashion claimed by the asserted patents." (Id.). However, Plaintiff provides that the "generalities" in Mr. Turi's opinion "fail to tie the combining of the asserted prior art references to the manner of combination described in [Plaintiff's] patents." (Doc. # 174 at 6).

The law grants a district court "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999). "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 419 (2007). A patent is invalid for

11

obviousness when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

"A party asserting that a patent is obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." PAR Pharm., Inc. v. TWI Pharms., Inc., 773 F.3d 1186, 1193 (Fed. Cir. 2014)(internal quotation marks omitted). "The determination of obviousness under 35 U.S.C. § 103 is a legal conclusion based on underlying facts." Allergan, Inc. v. Sandoz Inc., 726 F.3d 1286, 1290 (Fed. Cir. 2013) cert. denied, 134 S. Ct. 1764. These factual underpinnings include: (1) the scope of content of the prior art; (2) the difference between the prior art and asserted claims; (3) the level of ordinary skill in the relevant art; and (4) the objective evidence of non-

obviousness. See Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17-18 (1966).

"[S]ection 103 requires assessment of the invention as a whole." Princeton Biochemicals, Inc., 411 F.3d at 1337. "This 'as a whole' assessment of the invention requires a showing that an artisan of ordinary skill in the art at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would have selected the various elements from the prior art and combined them in the claimed manner." Id. Therefore, 35 U.S.C. § 103 "requires some suggestion or motivation, before the invention itself, to make the new combination." Id.

Upon review, the Court concludes that Mr. Turi's proffered opinions satisfy the reliability requirement for admissibility. Plaintiff's arguments can be boiled down to the contention that Mr. Turi should have used a different methodology in deriving his opinions concerning the invalidity and non-infringement of Defendants' product. The Court is not convinced by Plaintiff's position. In Taylor, Bean & Whitaker Mortgage Corp. v. GMAC Mortgage Corp., No. 5:05-cv-260-Oc-GRJ, 2008 WL 3819752, at *5 (M.D. Fla. Aug. 12, 2008), when evaluating the admissibility of an expert's damages testimony, the court rejected the argument that the

13

expert's testimony should be excluded because his opinions differed from the other party's experts, including using a different formula. The court noted:

> [T]hese arguments go more to the weight of the evidence, than the admissibility of the evidence under Daubert. The Court need not determine that the expert [defendant] seeks to offer into evidence is irrefutable or certainly correct. The certainty and correctness of [the expert's] opinion will be tested through cross-examination and presentation of contrary evidence and not by a Daubert challenge. Indeed the Court's role as gatekeeper is not intended to supplant the adversary system or the role of the jury.

Id.

The Court is in accordance with the reasoning espoused in Taylor, Bean & Whitaker. While Plaintiff has identified variables that are absent from Mr. Turi's testimony, Plaintiff has not shown that Mr. Turi's testimony rests on an infirm foundation. The Court determines that Mr. Turi's methodology is sufficiently sound and reliable to withstand Plaintiff's Daubert challenge. Plaintiff's objections directed to the reliability of Mr. Turi's opinion go to the weight of his testimony, rather than its admissibility. See Maiz v. Virani, 253 F.3d 641, 669 (11th Cir. 2001)(noting that objections to the methodology go to weight and sufficiency, not admissibility of expert testimony).

Plaintiff is reminded that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Allison</u>, 184 F.3d at 1311 (quoting <u>Daubert</u>, 509 U.S. at 596). Specifically, Plaintiff will have the opportunity to cross examine Mr. Turi on his substantive opinions, including his opinions that one of ordinary skill in the art would have combined the prior art in the manner claimed by the Patents.

### iii.   Assist the Trier of Fact

#### a. Whether Mr. Turi is a "Mere Conduit" for Counsel

According to Plaintiff, Mr. Turi's testimony "makes clear that, rather than being a qualified expert witness, Mr. Turi's role is that of a mere hired Trojan horse, a hollow shell to carry the ideas and arguments of Defendants' counsel into the courthouse and present them to this Court and the jury." (Doc. # 128 at 12). The invalidity report, which bears his name, "renders ultimate opinions (phrased in sophisticated legal argument) that all the asserted claims of each of [Plaintiff's] asserted patents are invalid." (Doc. # 174 at 6). However, Mr. Turi "admits he had no background or experience with patents prior to his engagement as an expert

15

witness in this case and did not know a single ground for invalidating a patent." (Id. at 7). Likewise, the non-infringement report "contains lengthy written descriptions regarding [Plaintiff's] asserted patents and legal analysis as to why they supposedly are not infringed by Defendants' payment systems." (Id.). According to Plaintiff, "[t]his is hardly the opinion of a man who admits that he did not have any background or experience regarding patent infringement before being engaged in this case." (Id. at 8).

Defendants suggest that Mr. Turi's reports contain his independent opinions, and counsel's assistance is appropriate under the Federal Rules and this Court's precedent. (Doc. # 153 at 16-19)(citing Linq Indus. Fabrics, Inc. v. Intertape Polymer Corp., No. 8:03-cv-528-T-30MAP, 2004 WL 5575053, at *1 (M.D. Fla. June 21, 2004)). Defendants contend that Mr. Turi performed the appropriate analysis and provided counsel with his substantive opinions, which occurred after Mr. Turi reviewed each patent and associated prosecution history as well as relevant technical details regarding the accused products and had conversations with relevant employees of Defendants. (Id. at 17-18). Counsel then assisted Mr. Turi with reducing those opinions to writing, and Mr. Turi remained involved with editing of his reports. (Id.).

As stated in <u>Linq Industrial Fabrics, Inc.</u>,

> An expert witness is not required to generate his own report; counsel is permitted to "actually put pen to paper (or fingers to keyboard)" **so long as the expert expresses his opinions to counsel before the report is generated and remains involved in the editing of the report.** <u>See</u> Advisory Committee Notes to 1993 amendments to Fed. R. Civ. P. 26 ("Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports"); <u>Isom v. Howmedica, Inc.</u>, 2002 WL 1052030 (N.D. Ill. 2002) (finding that although some of the language in the report may have been chosen by counsel, expert was sufficiently involved in preparation and revision of report that it could be fairly considered as setting forth his opinions, not those of counsel).

2004 WL 5575053, at *1 (emphasis added). At the <u>Daubert</u> hearing, Mr. Turi explained that he provided Defendants' counsel with the content of his opinion. As Mr. Turi has never previously been an expert witness, Mr. Turi asked Defendants' counsel to prepare a draft of his opinion, to which Mr. Turi provided extensive corrections to ensure that his opinion was conveyed. Based on Mr. Turi's representations, the Court concludes that Mr. Turi did not act as a "mere conduit" for Defendants' counsel, as suggested by Plaintiff. Rather, Mr. Turi was actively engaged in the production of his expert reports.

### b. **Whether Mr. Turi Seeks to Rebut Plaintiff's Damages Expert**

Plaintiff contends that Mr. Turi "improperly seeks to rebut [Plaintiff's] damages expert." (Doc. # 128 at 13). At the end of Mr. Turi's non-infringement report, there is a rebuttal to the expert damages report submitted by Plaintiff's expert, Mr. Weston Anson:

> I understand that [Plaintiff's] damages expert, Weston Anson, has relied on 7 agreements in this litigation. I have been asked to review the agreements to determine if the technology involved in those licenses is comparable to the technology at issue in this case.

(Id.). Plaintiff suggests that Mr. Turi then provides his "rebuttal" to Mr. Anson's decision to use those seven agreements as comparable agreements, in his damages analysis. (Id.). According to Plaintiff, Defendants never disclosed Mr. Turi as a rebuttal damages expert but, instead, disclosed Dr. Edward T. Wolpert as their rebuttal damages expert. (Id.). Therefore, Plaintiff provides that it is improper for Defendants to use Mr. Turi for that same purpose and, at a minimum, section XIV of Mr. Turi's non-infringement report titled "Comparability of Technology in identified agreements" should be stricken. (Id.).

In their response, Defendants argue that Mr. Turi does not purport to be a damages expert. (Doc. # 153 at 21). Rather, Mr. Turi is a "technical expert" who "reviewed the subject matter of the seven agreements relied upon by Mr. Anson to determine whether that subject matter is, in fact, comparable to the subject matter of [Plaintiff's] patents." (Id.). Mr. Turi determined that "none of the agreements relied upon by Mr. Anson involves technology of an overlapping scope that may have some comparable scope to the technology at issue in this case." (Id.). Conversely, Mr. Wolpert, who likewise is not a technical expert, "relied in part upon Mr. Turi's opinions in reaching his conclusion that the several agreements are not relevant to determining a reasonable royalty." (Id.).

The Court agrees with Plaintiff that Defendants should not be allowed to use two rebuttal experts on the issue of damages. However, it appears that Mr. Turi looked at the seven agreements for a different purpose than Mr. Wolpert did. Thus, Mr. Turi should not be excluded on this ground.

Expert testimony is helpful to the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." United States v. Frazier, 387 F.2d 1260, 1262 (11th Cir. 2004). In other words, "[p]roffered expert

19

testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63.

As previously noted, invalidity of patents and non-infringement of patents is an appropriate subject for expert testimony, and the Court concludes that Mr. Turi's testimony will assist the trier of fact in determining facts in issue, particularly regarding issues of infringement. The Court accordingly denies Plaintiff's Motion to exclude Mr. Turi as an expert witness. However, the Court notes that, during the trial, the Court may revisit this ruling in the instance that Plaintiff demonstrates that any prong of Rule 702 is unfulfilled.

### b. **Defendants' Motion**

Defendants move to exclude the testimony of Plaintiff's damages expert, Mr. Weston Anson. (See Doc. # 144). Defendants contend that Mr. Anson's "Market Approach" "(1) is not recognized or approved by the Federal Circuit as a proper approach for calculating a reasonable royalty; (2) relies on thousands of non-comparable, unanalyzed license agreements; (3) defies Plaintiff's lone prior license agreement regarding the asserted patents; and (4) is impermissibly applied to non-infringing revenue of Defendants." (Id. at 1).

20

### i.  Competence and Qualification

Defendants do not take issue with the competence or qualification of Mr. Anson as an expert on the calculation of a reasonable royalty rate. Rather, Defendants' Motion focuses on the methodology relied upon by Mr. Anson. (See Doc. # 144). Therefore, this Court concludes that Mr. Anson is competent to testify as an expert in this matter by virtue of his knowledge, skill, training, and experience.

### ii.  Methodology

In this action, Plaintiff seeks reasonable royalty damages for Defendants' alleged infringement. (Doc. # 144 at 2). Although Defendants contend that Plaintiff is not entitled to any damages or other relief, Defendants do not dispute that the correct remedy is a reasonable royalty, in the event that the jury finds that Defendants did infringe Plaintiff's patents. (Id.). But, Defendants suggest that Mr. Anson uses an "unrecognized approach" to "arrive at an inflated running royalty rate, which is not tied to the specific facts of this case." (Id.). Defendants take issue with Mr. Anson's methodology for several reasons, and the Court will address each in turn.

### a. Whether Mr. Anson's "Market Approach" is Recognized by the Federal Circuit

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "A reasonable royalty typically is determined from the hypothetical results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began." Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1579 (Fed. Cir. 1996).

According to Defendants, Mr. Anson's "Market Approach" is not approved by the Federal Circuit. (Doc. # 144 at 7). Rather, at best, the "Market Approach" is a broad application of the first two Georgia-Pacific factors, which address "(1) [t]he royalties received by the patentee for the licensing of the patent in suit. . . ." and "(2) [t]he rates paid by the [infringer] for the use of other patents comparable to the patent in suit." (Id.)(citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

Mr. Anson admits to not using the Georgia-Pacific factors in his analysis. (Doc. # 144 at 8). In fact, Mr. Anson referred to the factors during his deposition as "outmoded" (i.e., outdated, old-fashioned). (Id.). "Due in part to Mr. Anson's complete lack of regard for the Georgia-Pacific

factors," Defendants posit that his testimony does not "carefully tie proof of damages to the claimed invention's footprint in the market place." (Id. at 9)(quoting Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011)). As such, Defendants contend that Mr. Anson's testimony must be excluded. (See Doc. # 144).

According to Plaintiff, Mr. Anson's use of the "Market Approach" to calculate a reasonable royalty in this case is entirely appropriate. (Doc. # 162 at 1). Namely, Plaintiff argues that the Federal Circuit does not require use of Georgia-Pacific factors to calculate a reasonable royalty, and the "Market Approach" is an accepted methodology. (Id.). In fact, Plaintiff submits that "the Federal Circuit acknowledges that 'there may be more than one reliable method for estimating a reasonable royalty.'" (Id. at 4)(citing Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014)).

According to Plaintiff:

Mr. Anson's expert report reviews various valuation methodologies that could be used to calculate damages and discloses that, under the circumstances of this case, "the market approach provided the strongest indication of an appropriate royalty rate." Mr. Anson's report further states that the "market approach values intellectual properties by

comparing the subject asset to publically available transactions involving similar assets with similar uses." In other words, the market approach used by Mr. Anson looks at comparable license agreements in order to determine a reasonable royalty.

(Id. at 4-5).

"A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)." ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 868-69 (Fed. Cir. 2010). However, the Federal Circuit has indicated that it does not require that witnesses use any or all of the Georgia-Pacific factors when testifying about damages in patent cases. Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 31 (Fed. Cir. 2012). In fact, "there may be more than one reliable method for estimating a reasonable royalty." Apple Inc., 757 F.3d at 1315 (citing In re Innovatio IP Ventures, LLC Patent Litig., No. 11 C 9308, 2013 WL 5593609, at *30-40 (N.D. Ill. Oct. 3, 2013) (undertaking a detailed evaluation of the different methods proposed by the parties of valuing the patents at issue)).

"All approaches have certain strengths and weaknesses and, depending upon the facts, one or all may produce

24

admissible testimony in a single case. It is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses may be exposed at trial or attacked during cross-examination." Id. "That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible." Id. Therefore, the Court declines to adopt Defendants' position. Defendants' disagreement with Mr. Anson's use of the "Market Approach" is better addressed on cross-examination and via their own damages expert.

### b. Whether Mr. Anson's "Market Approach" is Fundamentally Flawed and Must be Excluded

Mr. Anson opined that the proper royalty rate in this case would be 5.0%. (Doc. # 144 at 4, 11). Mr. Anson applied this proffered royalty rate of 5.0% to revenue generated by (or forecasted by) Defendants between January of 2012, and September of 2014, to arrive at his proffered damages award. (Id. at 4). Mr. Anson arrived at his proffered 5.0% royalty rate using a "Market Approach." (Id. at 2).

Using this "Market Approach," Mr. Anson "collected license-transaction data from multiple database sources." (Id. at 3). "Overall, Mr. Anson identified more than 106,000 license agreements: (i) 5,156 'patent license agreements'

from RoyaltyStat® database; (ii) 1,190 'process patent license agreements' from a RoyaltyStat® database; and (iii) more than 100,000 license agreements from a ktMINE database." (Id.). After reviewing these "databases," Mr. Anson identified "seven agreements in which intellectual properties comparable to [Plaintiff's] Patented System were licensed." (Id.). Mr. Anson arrived at his proffered royalty rate of 5.0% here "in light of the median royalty rate of these seven 'comparable' agreements, which was 5.0%." (Id.).

Defendants submit that Mr. Anson has completely failed to present any testimony showing a "discernible link" between each of these 1,190 process patents and the technology claimed in the 904 and 748 Patent. (Id. at 11-12)(citing Lucent Techs., Inc. v. Gateway, 580 F.3d 1301, 1327–28 (Fed. Cir. 2009); ResQNet.com, Inc., 594 F.3d at 869). Rather, Defendants state that Mr. Anson "alleges comparability based on the alleged fact that these 1,190 patents are 'process' patents." (Id. at 12). According to Defendants, this is insufficient to "carefully tie proof of damages to the claimed invention's footprint in the market place." (Id.)(citing Uniloc USA, Inc., 632 F.3d at 1317).

Defendants argue that Mr. Anson's testimony and "Market Approach" concerning the seven purportedly comparable

licenses must likewise be excluded under <u>Daubert</u>. (<u>Id.</u> at 14). "The Federal Circuit prohibits an expert's reliance on 'licenses with no relationship to the claimed invention.'" (<u>Id.</u>)(quoting <u>ResQNet</u>, 594 F.3d at 870). Rather, an expert must show a "discernible link" between the technology in any relied-on licenses and the claimed technology at issue. (<u>Id.</u>). According to Defendants, "Mr. Anson has provided no technical testimony showing that the technology licensed in these seven agreements is substantially similar to the technology claimed by the 904 Patent and 748 Patent." (<u>Id.</u> at 15).

Plaintiff posits, however, that "Mr. Anson bases his opinion that five percent (5%) is a reasonable royalty rate in this case on a collage of three data points: (a) [Plaintiff's] existing License Agreement with ECHO covering the patents in suit; (b) the median royalty rate of a group of seven (7) licenses selected as the closest comparable licenses from databases containing over 100,000 license agreements; and (c) the median royalty for a sub-set of 1,190 license agreements for process patents." (Doc. # 162 at 7).

Plaintiff further contends that no basis exists to preclude Mr. Anson's testimony based on the seven comparable licenses he selected. (<u>Id.</u> at 8). Mr. Anson "undertook a

rigorous and time consuming analysis to select the seven (7) licenses [he] deemed to be comparable to the license that would have been the subject of the hypothetical negotiation between [Plaintiff] and Defendants." (Id. at 8-9). Mr. Anson "read the group of 20-25 license agreement[s] to arrive at the final seven (7)." (Id. at 10).

"[E]stimating a 'reasonable royalty' is not an exact science." Apple Inc., 757 F.3d at 1314. Courts performing reasonable royalty calculations are to exercise vigilance when considering past licenses to technologies other than the patent in suit. See ResQNet.com, Inc., 594 F.3d at 869. "Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." Id. When relying on licenses to prove a reasonable royalty, "loose or vague comparability between different technologies or licenses does not suffice." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012). A district court "must account for differences in the technologies and economic circumstances of the contracting parties[.]" Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1330 (Fed. Cir. 2014)(internal quotation marks omitted).

According to Plaintiff, issues surrounding Mr. Anson's opinions go to the weight of evidence and not their admissibility. (Doc. # 162 at 11-12). Thus, Defendants' recourse, if they disagree with Anson's selection of comparable licenses, is through their own expert witness and cross-examination. (Id.). This Court agrees.

While Defendants provide noteworthy argument, the Court finds that Defendants have not sufficiently shown that Mr. Anson's opinions are based on unsound foundation. The Court determines that Mr. Anson's methodology is reliable to withstand Defendants' Daubert challenge. Defendants' objections directed to the reliability of Mr. Anson's opinion go to the weight of his testimony, rather than its admissibility. See Maiz, 253 F.3d at 669. As noted above, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Allison, 184 F.3d at 1311 (quoting Daubert, 509 U.S. at 596).

   c. **Whether Inflation of ECHO Health Inc. Royalty Rate is Neither Based on Sufficient Facts or Data nor the Product of Reliable Principles and Methods**

Defendants suggest that Mr. Anson "impermissibly" inflated "Plaintiff's prior 3.81% royalty rate in the ECHO License Agreement in an attempt to validate his proposed 5.0% royalty rate under his Market Approach." (Doc. # 144 at 19). This inflation is based on a purported 25% "first mover discount" afforded to ECHO by Plaintiff. (Id. at 20). However, Defendants argue that Mr. Anson provides "no facts or data that demonstrate a 25% 'first mover discount' was afforded to the licensee in the ECHO License Agreement." (Id.).

In any event, Defendants state that the ECHO License Agreement was not entered into until May 1, 2014. (Id.). However, Defendants' alleged infringement of the 904 Patent began at least by January 1, 2013, when the patent was issued. (Id.). Thus, according to Defendants, the date of the hypothetical negotiation between Plaintiff and Defendants is at least January 1, 2013, which predates the ECHO License Agreement. (Id. at 21). Accordingly, under Mr. Anson's theory, Defendants – and not ECHO – would have been afforded the first-mover discount, whatever it was, that resulted in the effective 3.81% royalty rate. (Id.).

"Mr. Anson nonetheless contends that Defendants (rather than ECHO) would not have received the first-mover discount because PPS was a 'small company. . . .'" (Doc. # 180 at 10).

30

However, Defendants submit that this opinion is not based on any fact or data in this case, but rather, information outside of the four corners of the ECHO License Agreement. (Id.). Accordingly, Defendants suggest that Mr. Anson's inflation is not sufficiently tied to the specific facts of this case. (See Doc. ## 144, 180).

Plaintiff argues that Mr. Anson's opinions regarding the adjusted royalty rate of Plaintiff's license agreement with ECHO are sufficiently tied to the facts of this case and should not be excluded. (See Doc. # 162). In Mr. Anson's "licensing parlance, a 'first mover discount' is the discount (in the range of 25% to 33%) normally given to the first substantial licensee." (Id. at 12). Mr. Anson's adjustment of the royalty rate of the ECHO License Agreement to account for the "first mover discount" is supported both by the explicit provisions of the ECHO License Agreement itself and Mr. Anson's 25 years of licensing experience. (Id. at 13). Paragraph 1.07 of the ECHO License Agreement states:

> The Terms and provisions of the Agreement, including, without limitation, the rates of royalty and terms of release have been negotiated by the parties based on ECHO's status as a first licensee. **The terms and provisions of this Agreement are more favorable to ECHO, given ECHO's large market presence and its status as a first licensee, that**

31

> **what STONEEAGLE would agree to in arms-length transactions with others.**

(Id.)(emphasis in original).

Furthermore, Plaintiff contends that Defendants are wrong in asserting that Defendants would be entitled to a "first mover discount" in a hypothetical negotiation. (Id. at 14). Mr. Anson testified that such a discount would only be applicable if the "first mover" was a "large, meaningful player in the marketplace" and that a "small company just beginning to enter the marketplace" is not likely to get a first mover discount. (Id.).

Upon review, and based on the representations made at the Daubert hearing, the Court finds that Mr. Anson's opinions on this matter are based on sufficiently sound reasoning and methodology. Mr. Anson provided an explanation as to why ECHO received the "first mover discount," and Defendants' arguments to the contrary are better suited for rebuttal expert testimony and cross-examination.

### d. Whether Mr. Anson's Royalty Base Impermissibly Includes Non-Infringing Revenue

Finally, Defendants argue that Mr. Anson applied his royalty rate of 5.0% to non-infringing revenue of Defendants. (Doc. # 144 at 21). In particular, Mr. Anson "applied his royalty rate to revenue data (including forecasted data)

provided by Defendants for the time period from January 2012 – September 2014 . . . irrespective of whether or not a patent had been issued or allegedly infringing actively was occurring." (Id.).

According to Defendants, "it is undisputed that Defendants' alleged infringement of the 904 Patent ended on October 9, 2013 when the Defendants discontinued the 'one fax system' in favor of the 'two fax system.'" (Id. at 22). Additionally, "it is undisputed that the 748 Patent did not reissue until February 4, 2014." (Id.). Thus, Defendants posit that there is a four-month span in which Defendants' "two fax system" and "hard copy mailing system" did not infringe either the 904 Patent or the 748 Patent. (Id.). Therefore, the ability of Plaintiff to recover pre-reissue damages during this time with respect to the 748 Patent is extremely limited under 35 U.S.C. § 252: A patentee may only recover damages prior to the reissue patent (back to the issuance of the original patent) if "the claims of the original and reissued patents are substantially identical." (Id.)(quoting 35 U.S.C. § 252).

According to Defendants, Mr. Anson has failed to provide any testimony demonstrating that the new claims of the 904 and 748 Patents are "substantially identical" to the claims

of the original 686 parent patent. (Id. at 23). Thus, with respect to the 748 Patent, Defendants submit that Plaintiff cannot collect damages for any activities performed by Defendants prior to the issuance of the new claims added during reissue. (Id.).

According to Plaintiff:

[Plaintiff] concedes the Defendants' "two-fax method" does not infringe its 904 Patent. The Defendants' two-fax method does, however, infringe [Plaintiff's] [748 Patent], which reissued on February 4, 2014.

Mr. Anson's opinion that damages are recoverable during the four (4) months before the 748 Patent issued, because of the nature of the reasonable royalty hypothetical negotiation, is sound. Mr. Anson opined that, in a hypothetical negotiation between [Plaintiff] and Defendants, they would have negotiated for a license to the type of "bundle of technology" that is covered by the ECHO License. . . . Thus, Mr. Anson has opined that, under the hypothetical negotiation, Defendants would have entered into and paid for a license having the same scope as the ECHO License.

The ECHO License defines "royalty bearing transaction" to include "the delivery of a Virtual Card to a healthcare provider of goods and services in combination with an EOB." Defendants' "two-fax method" falls squarely within this definition. Accordingly, under the hypothetical negotiation testified to by Mr. Anson, Defendants would owe royalties to [Plaintiff] for the entire time they used the "two-fax method," even before the 748 Patent reissued.

(Doc. # 162 at 15-16).

"A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder." Apple Inc., 757 F.3d at 1314; see, e.g., Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000)("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact."). "The gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages." Id.

Here, the Court is satisfied with Mr. Anson's testimony regarding the reasonable royalty rate in this action. At the Motion hearing, Mr. Anson explained that when he was opining as to a reasonable royalty rate, he focused his attention on a hypothetical negotiation that occurred in 2012, that would include the entire "bundle of rights." (Doc. # 200). To that end, Mr. Anson did not speculate the existence of an intermittent period where infringement would not occur, as

suggested by Defendants. Any disagreement Defendants have with Mr. Anson's opinion can be addressed on cross-examination.

### iii. **Helpful to the Trier of Fact**

As stated above, "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005). For the reasons set forth above, the Court finds that Mr. Anson's testimony – which involves the difficult concept of damages in a patent action – to be helpful to the trier of fact.

Accordingly, Defendants' Motion to Exclude Testimony of Mr. Weston Anson is denied. However, the Court notes that, during the trial, the Court may revisit this ruling in the instance that Defendants demonstrate that any prong of Rule 702 is unfulfilled.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)     Plaintiff's Daubert Motion to Exclude Thomas N. Turi as
        an Expert Witness (Doc. # 128) is **DENIED**.

(2)     Defendants' Motion to Exclude Testimony of Mr. Weston
        Anson (Doc. # 144) is **DENIED**.

        **DONE** and **ORDERED** in Chambers in Tampa, Florida, this
19th day of June, 2015.


VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies: All counsel of record